## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RONALD DANIELS,** | : | **CIVIL ACTION NO. 1:14-CV-1568** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, DEPARTMENT** | : | |
| **OF LABOR AND INDUSTRY,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

### MEMORANDUM

The instant motion (Doc. 13) is filed pursuant to Federal Rule of Civil Procedure 56 by defendants Commonwealth of Pennsylvania, Department of Labor and Industry ("Department"), Office of Administration, and Office of Information Technology (collectively, "Commonwealth"), and several current and former officials therein.  Defendants seeks summary judgment with respect to all claims asserted by Ronald Daniels ("Daniels"), a former Department official, who alleges that defendants retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. §§ 951–963; and the Pennsylvania Whistleblower Act, 43 PA. CONS. STAT. §§ 1421–1428.  The court will grant defendants' motion in part, and remand Daniels' whistleblower claims to the Commonwealth Court of Pennsylvania.

**I.**     <u>**Factual Background & Procedural History**</u>[1]

Daniels, an African-American male, was employed at will by the Department as Executive Director, Chief Information Office ("CIO"), from December 29, 2008 through January 14, 2013.  (Doc. 18 ¶¶ 1-2, 133; Doc. 26-1 ¶¶ 1-2, 133).  In this position, Daniels reported to the CIO of the Office of Administration and to the Deputy Secretary of the Department.  (Doc. 18 ¶ 3; Doc. 26-1 ¶ 3).

Defendant George White ("White") served as CIO of the Office of Administration from approximately December 2010 through December 28, 2012, at which point defendant Tony Encinias ("Encinias") was appointed to the position. (Doc. 18 ¶¶ 7, 11; Doc. 26-1 ¶¶ 7, 11; Doc. 18-7, Encinias Dep. 9:24-10:22, Jan. 12, 2015 ("Encinias Dep.")).  Defendant Terry Singer ("Singer") occupied the role of Deputy Secretary of the Department from July 2011 through January 2013.  (Doc. 18 ¶¶ 4-5; Doc. 26-1 ¶¶ 4-5).  At all times relevant to the instant action, Daniels reported to Singer and to White, followed by Encinias.   (Doc. 18 ¶¶ 7, 14; Doc. 26-1 ¶¶ 7, 14).

Singer reported to defendant Julia Hearthway ("Hearthway"), who served as Secretary of the Department between April 2011 and January 2015.  (Doc. 18 ¶ 10; Doc. 26-1 ¶ 10; Doc. 18-6, Hearthway Dep. 8:18-9:5, Mar. 25, 2015 ("Hearthway Dep.")).  Defendant Gregg Shore ("Shore") became Deputy Secretary of Unemployment Compensation Programs for the Department in October 2011, placing him on the senior management team with Daniels.  (Doc. 18 ¶ 15; Doc. 26-1

---

[1] To the extent facts are undisputed or supported by uncontroverted record evidence, the court cites directly to the parties' statements of material facts.  (<u>See</u> Doc. 18; Doc. 26-1; Doc. 26-2).

¶ 15).  All of the aforementioned defendants are Caucasian.  (Doc. 26-3, Daniels Dep. 71:7-71:10, 73:21-73:23, 112:23-113:10, Apr. 3, 2015 ("Daniels Dep.")).

As CIO of the Department, Daniels' responsibilities included overseeing information technology ("IT") operations, managing staff and consultants, purchasing hardware and software, and negotiating IT contracts.  (Daniels Dep. 15:15-15:24).  Specifically, Daniels supervised employees assigned to the Unemployment Compensation Modernization System ("UCMS"), a project commenced in partnership with IBM in 2006 to automate the Department's unemployment payment system.  (Doc. 18-5, Singer Dep. 34:6-34:14, Oct. 31, 2014 ("Singer Dep."); Daniels Dep. 25:25-26:8).  Daniels attended regular UCMS steering committee meetings with IBM contractors and Department representatives.  (Daniels Dep. 41:12-42:17).  Widely regarded as unsuccessful, the UCMS project was notoriously over budget and behind schedule.  (Doc. 18 ¶¶ 58-59; Doc. 26-1 ¶¶ 58-59).  In 2012, Daniels discovered that IBM had purportedly engaged in double billing and charged the Department for unperformed services on multiple occasions.  (Doc. 18 ¶¶ 69, 72-73; Doc. 26-1 ¶¶ 69, 72-73).  Daniels reported IBM's allegedly fraudulent practices to Singer, who communicated Daniels' findings to Hearthway.  (Doc. 18 ¶¶ 69, 72; Doc. 26-1 ¶¶ 69, 72).  Daniels states that thereafter, Shore would "scream" at him in meetings and send him "berating" emails, and that on one occasion during an internal staff meeting, Hearthway characterized the information provided by Daniels as "poison."  (Daniels Dep. 73:1-73:13, 112:1-112:22, 127:8-127:15).

In the summer of 2012, Singer removed Daniels from the UCMS project. (Doc. 18 ¶ 45; Doc. 26-1 ¶ 45).  According to Daniels, Singer explained that the Department "wanted to go in a new direction and get new people involved." (Daniels Dep. 43:1-43:2).  Singer states that Daniels' behavior at UCMS steering committee meetings was belligerent and disrespectful.  (Singer Dep. 20:19-21:7). Further, Hearthway indicates that Daniels demeaned employees who were assigned to the UCMS project.  (Hearthway Dep. 74:2-74:19).  Additionally during the summer of 2012, Hearthway discontinued Daniels' participation in internal staff meetings attended by senior managers from the Department and the Office of Administration.  (Daniels Dep. 72:1-72:12).  Hearthway offered no explanation for this sudden change in protocol.  (Id. 72:21-72:22).

Shortly thereafter, Daniels indicates that he experienced a pattern of antagonistic behavior from defendants, which persisted through January 2013. (Id. 105:25-108:4).  Specifically, Daniels contends that Hearthway, Shore, and others usurped his core responsibilities as CIO and adopted a hostile demeanor in their communications with him.  (Id.)  Daniels states that he complained of disparate racial treatment to the Department's executive management team in October 2012 by letter and in December 2012 by email.  (Doc. 1-3 ¶¶ 50-51).

In the fall of 2012, Shore, Hearthway, and Singer sought to transfer Department employee Lucas Everly ("Everly") to a civil service position in IT. (Doc. 18 ¶¶ 86-93, 95; Doc. 26-1 ¶¶ 86-93, 95).  According to Daniels, Singer and Shore pressured the Department's Human Resources Director to violate civil service laws in order to accomplish Everly's transfer.  (Daniels Dep. 50:22-53:14).  Subsequent to

Everly's formal interview with IT, Daniels met with Singer to express concerns. (Doc. 18 ¶ 107; Doc. 26-1 ¶ 107; Daniels Dep. 67:5-67:24; Doc. 18-10, Amanda Lawrence Dep. 28:13-29:10, Jan. 15, 2015 ("Lawrence Dep.")).  Daniels asserts that during the meeting, Singer asked him to "make the job as unattractive as possible," for the purpose of dissuading a furloughee with hiring preference from applying. (Daniels Dep. 67:5-67:24; Doc. 18-9, Kristen Gardner Dep. 40:21-41:3, Jan. 15, 2015 ("Gardner Dep.")).  Daniels refused to comply with Singer's request.  (Daniels Dep. 67:23-67:24).  Ultimately, the Department elected not to fill the position, and Everly accepted a role in the Department's press office.  (Doc. 18 ¶¶ 106, 109; Doc. 26-1 ¶¶ 106, 109).

On November 18, 2012, Daniels sent a confidential memorandum titled "Unprofessional Conduct at PA Department of Labor and Industry" to nine state legislators, including Representative Ron Waters, Chairman of the Pennsylvania Legislative Black Caucus.  (Doc. 26-6, Nov. 18, 2012 ("Daniels Memorandum"); Doc. 18 ¶ 55; Doc. 26-1 ¶ 55).  Therein, Daniels described a "disturbing pattern of unprofessional and discriminatory behavior" in the Department, highlighting his status as the only African-American member of the Department's executive management team.  (Daniels Memorandum at 1).  Daniels detailed the circumstances surrounding the UCMS project and the Everly hiring situation and complained of exclusion from several Department IT projects and contract negotiations.  (Id. at 2).

Daniels states that he shared his memorandum with the Equal Employment Opportunity Directors at the Department and at the Office of Administration.

5

(Daniels Dep. 76:12-76:23, 117:8-117:10).  Daniels further asserts that he met with the Department's Equal Employment Opportunity Director during the latter part of 2012, wherein he reported disparate treatment on the basis of race by Shore and Hearthway.  (Id. 69:11-76:24).

In November 2012, the Department acquired new software which generated monthly reports of each employee's internet and bandwidth usage.  (Doc. 18 ¶¶ 113-14; Doc. 26-1 ¶¶ 113-14).  Daniels' exceptional monthly bandwidth usage—second highest in the Department—prompted an investigation into his internet history.  (Doc. 18 ¶ 121; Doc. 26-1 ¶ 121).  The Office of Administration Forensic department performed the investigation, which revealed a surfeit of websites displaying pornographic images and videos.  (Doc. 18 ¶¶ 114-15; Doc. 26-1 ¶¶ 114-15).

Hearthway states that when she learned of Daniels' unauthorized computer usage, she had already decided to terminate his employment.  (Doc. 18 ¶ 121; Doc. 26-1 ¶ 121).  Hearthway also indicates that she discussed Daniels' separation with Shore, Singer, Encinias, and Art McNulty, Legal Counsel for the Department.  (Hearthway Dep. 70:24-71:15; see Encinias Dep. 34:13-36:18).  Hearthway cites poor leadership, lack of respect from subordinates, inability to work with others, and IT department underperformance as reasons for Daniels' termination.  (Hearthway Dep. 74:2-74:23).  Singer also asserts that Daniels was frequently absent and unreachable during standard office hours.  (Singer Dep. 22:14-23:10).  Daniels' former assistant, Kristen Gardner, corroborates Singer's representation.  (Gardner Dep. 48:9-52:17).

On January 14, 2013, Human Resources representatives from the Department and from the Office of Administration informed Daniels that his services were no longer required.  (Doc. 18 ¶ 133; Doc. 26-1 ¶ 133).  Presented with the choice to either resign or be terminated, Daniels elected to resign.  (Doc. 18 ¶ 134; Doc. 26-1 ¶ 134).  Prior to his separation, Daniels had received no negative performance reviews, adverse feedback, or discipline during his tenure with the Department.  (Daniels Dep. 108:5-108:20, 109:25-110:20; see Singer Dep. 20:1-29:12; Gardner Dep. 62:6-63:19; Doc. 26-4 ¶ 7, Dec. 20, 2013, Defendants' Response to Interrogatories).

On April 23, 2013, Daniels instituted the above-captioned action in the Court of Common Pleas of Dauphin County, Pennsylvania.  (See Doc. 1-2).  The original complaint alleged one count of retaliation against defendants under the Pennsylvania Whistleblower Act.  (See id.)  On July 11, 2013, the parties stipulated to transfer the matter to the Commonwealth Court of Pennsylvania.  (See Doc. 1 ¶ 2).  Daniels subsequently filed an amended complaint on June 12, 2014, adding retaliation claims under Title VII and the PHRA.  (See Doc. 1-3).

On August 8, 2014, the parties removed the action to this court, asserting federal subject matter jurisdiction over the Title VII claim.  See 28 U.S.C. § 1441(a).  Specifically, Daniels alleges that the Commonwealth retaliated against him for opposing racial discrimination and that all named defendants retaliated against him for reporting instances of wrongdoing and waste.  (Doc. 1-3 ¶¶ 53-67).  On June 3, 2015, defendants filed the instant motion (Doc. 13) for summary judgment, alleging

that Daniels has failed to proffer evidence sufficient to support any of his claims. The motion has been fully briefed and is ripe for disposition.

## II.   <u>Legal Standard</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see</u> <u>also</u> FED. R. CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.   <u>Discussion</u>

Daniels alleges that the Commonwealth retaliated against him for complaining of racially motivated disparate treatment and that defendants retaliated against him for alerting authorities to occurrences of wrongdoing and waste within the Department.  The court will first address Daniels' claim of retaliatory discrimination based on race.

## A.      Title VII and PHRA Retaliation Claims[2]

The gravamen of Daniels' claims is that the Commonwealth engaged in retaliation by discharging him for opposing allegedly discriminatory conduct by the Department's executive management.  Title VII proscribes retaliation by an employer against employees "because [they] ha[ve] opposed any practice made an unlawful employment practice" by Title VII's anti-discrimination provision. 42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006).  If the plaintiff establishes a *prima facie* case of retaliation, the McDonnell Douglas burden-shifting paradigm applies: " '[T]he burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action.'  If the employer satisfies that burden, the plaintiff must then prove that 'retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.' "  Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)); see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

---

[2] Analysis of a retaliation claim under the PHRA is equivalent to that under Title VII.  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002); Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); Syed v. YWCA of Hanover, 906 F. Supp. 2d 345, 354 (M.D. Pa. 2012).  The disquisition that follows applies to the claims arising under both statutes.

In the matter *sub judice*, defendants contend that Daniels fails to adduce sufficient evidence to make out a *prima facie* case of retaliation under Title VII. (Doc. 19 at 16-18).  Specifically, defendants assert first that Daniels' reports of racial discrimination do not qualify as statutorily protected activity, and second, that Daniels fails to establish a causal connection between any statutorily protected conduct and his termination.  (Id.)  The court will address these arguments *seriatim*.

### 1.   *Protected Activity*

An employee engages in protected activity when he opposes employer conduct which Title VII prohibits.  See Slagle v. Cty. of Clarion, 435 F.3d 262, 266 (3d Cir. 2006).  "Opposition" often takes the form of internal workplace complaints highlighting treatment accorded the plaintiff or other employees.  See Curay-Cramer v. Ursuline Acad. of Wilmington, 450 F.3d 130, 135 (3d Cir. 2006); Slagle, 435 F.3d at 266.  At the time of his opposition, the employee must possess a good faith belief that the practices opposed were unlawful under Title VII. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001); Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015).  So long as a reasonable person could consider the underlying incidents unlawful, the actual illegality of the employer's conduct is irrelevant.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

In the instant case, Daniels alleges that he engaged in protected activity by: (1) in October 2012, sending a letter to Department management "explaining that he felt he was experiencing [racial] discrimination," (Doc. 1-3 ¶ 50); (2) in December

2012, "rais[ing] complaints of [racial] discrimination" in an email to Department management, (id. ¶ 51); (3) in November 2012, distributing a memorandum— to certain state legislators and to the Equal Employment Opportunity Directors at the Department and the Office of Administration—which described a "disturbing pattern" of racial discrimination against Daniels, (Daniels Dep. 76:12-76:23, 117:8-117:10); and (4) during the latter part of 2012, meeting with the Department's Equal Employment Opportunity Director to report incidents of disparate racial treatment by Shore and Hearthway, (id. 69:11-76:24).  Defendants aver that the foregoing conduct does not qualify as protected activity because no reasonable person could conclude that the incidents underlying Daniels' complaints constitute unlawful racial discrimination.  (Doc. 19 at 17).

Daniels asserts that the following circumstances, taken as a whole, could give rise to an inference of disparate treatment based on race: (1) his removal from the UCMS project and from various IT contract negotiations; (2) his removal from meetings of the executive management staff, then entirely comprised of Caucasian members; (3) antagonistic communications from defendants starting in the summer of 2012; (4) a paucity of negative feedback and critical performance reviews from his supervisors; (5) Hearthway's statement during a meeting that Daniels' IT information was "poison;" and (6) Shore's contumelious behavior toward Daniels. (Daniels Dep. 70:13-71:10, 73:1-73:13, 105:25-108:20, 109:25-110:20, 112:1-112:22, 127:8-127:15).  The court agrees with Daniels.

Notably, Daniels' testimony indicates that his managerial cohort was entirely Caucasian, an assertion which defendants do not challenge.  (Id. 71:7-71:10,

11

73:17-17:23).  Moreover, the facts of record demonstrate that Daniels received the equivalent of punitory treatment—*inter alia*, a sudden reduction in job duties and public admonishment by Hearthway—without a single negative performance appraisal in turn.  (Id. 73:1-73:23, 105:25-108:20).  Viewing the foregoing evidence *in toto* and in the light most favorable to Daniels, the court finds Daniels' good faith belief in the illegality of the underlying conduct to have been a reasonable one.  See Daniels, 776 F.3d at 193; Aman, 85 F.3d at 1085.  Thus, Daniels engaged in protected Title VII activity according to the first prong in the anti-retaliation analysis.

### 2.   *Causation*

To establish the causation element of a retaliation claim, a plaintiff must prove that his participation in a protected activity was a but-for cause of the adverse employment action.  Univ. of Tex. Sw. Med. Ctr. v. Nassar, __ U.S. __, 133 S. Ct. 2517, 2533 (2013); see Burton v. Pa. State Police, 990 F. Supp. 2d 478, 509 (M.D. Pa. 2014).  Any evidence "gleaned from the record as a whole" may support such a showing.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).  For example, the requisite causal connection may be established by demonstrating that the employer provided inconsistent reasons for terminating the employee.  See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232-33 (3d Cir. 2007). Additionally, in some circumstances, the temporal proximity between protected conduct and an adverse employment action may be sufficiently suggestive to make out a *prima facie* case of retaliation.  See id. at 232.  The Third Circuit cautions, however, that "each case must be considered with a careful eye to the specific facts and circumstances encountered."  Farrell, 206 F.3d at 279 n.5.

In the instant action, defendants assert that Daniels has not shown a causal link between his reports of racial discrimination and his dismissal. (Doc. 19 at 18). In response, Daniels does not direct the court to any evidence of record specifically germane to his Title VII protected conduct. (See Doc. 26 at 25). Instead, Daniels asserts generally that causation may be inferred from the temporal proximity between his termination and all instances of protected activity alleged herein: to wit, Daniels' complaints of race discrimination and his reports of waste and wrongdoing. (Id. at 20-22). Daniels further avers that certain inconsistencies in defendants' testimony are sufficient to demonstrate causation. (Id. at 22).

As discussed *supra*, the record indicates that Daniels complained of racially motivated disparate treatment in approximately October, November, and December of 2012. (Doc. 1-3 ¶¶ 50-51; Daniels Dep. 69:11-76:24, 117:8-117:10). The Commonwealth terminated Daniels' employment on January 14, 2013. (Doc. 18 ¶ 133; Doc. 26-1 ¶ 133). Hence, the difference in time between Daniels' Title VII protected activities and the corresponding adverse employment action ranges from two weeks to three months. A protected activity and an adverse employment action must be "very close" in time to prove causation. Breeden, 532 U.S. at 273-74. There is no bright-line rule for determining whether temporal proximity alone creates such an inference. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012). Nonetheless, courts typically find causation when the relevant events are linked by a time span of mere days, as opposed to weeks or months. See id. (listing cases); Farrell, 206 F.3d at 280.

The majority of the protected Title VII activity upon which Daniels relies transpired two to three months prior to his termination, and one or more instances occurred within the preceding two to six weeks.  This close temporal proximity is not "unusually suggestive" given the context of the case.  <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 503 (3d Cir. 1997).  During this time period, Daniels also opposed waste and wrongdoing within the Department on multiple occasions.   (<u>See</u> Doc. 26 at 20-22).  He conflates these two distinct forms of protected conduct herein for purposes of meeting his *prima facie* burden under Title VII.  However, without a direct and suggestive temporal link between Daniels' complaints of race discrimination and his ultimate discharge, Daniels' chronology does not give rise to an inference of causation.  <u>See</u> <u>LeBoon</u>, 503 F.3d at 232.

The court must additionally determine whether there is sufficient evidence in the record as a whole to establish that Daniels' complaints regarding disparate racial treatment caused his termination.  <u>See</u> <u>Farrell</u>, 206 F.3d at 281.  Daniels asserts that defendants "provided numerous conflicting assertions under oath about . . . who made the decision to terminate . . . [and] their bases for separation." (Doc. 26 at 22).  Daniels provides no citations to such conflicting testimony but posits that, when considered against the record *in extenso*, defendants' inconsistent statements demonstrate causation.  (<u>See</u> <u>id.</u>)  Following an independent review of the summary judgment record, the court finds Daniels' averments to be unfounded.

Ostensibly, Daniels refers first to a discrepancy between defendants' interrogatory responses and Hearthway's testimony.  In the relevant interrogatory response, White is identified as involved in the decisional process that led to

14

Daniels' termination; contrarily, Hearthway does not characterize White as such
during her deposition. (<u>Compare</u> Doc. 26-4 ¶ 5, Dec. 20, 2013, Defendants' Response
to Interrogatories, <u>with</u> Hearthway Dep. 70:24-72:4). Specifically, Hearthway is
unable to recall whether White was deceased at that point in time. (Hearthway
Dep. 72:1-72:7). Hearthway's less than pellucid recollection of the events which
preceded Daniels' termination is reasonable given the passage of over two years.
Her testimony therefore does not undermine defendants' interrogatory response.

Daniels further implies that Hearthway's testimony and Singer's testimony
differ with respect to the reasons tendered for Daniels' termination. (<u>See</u> Doc. 26 at
22). Hearthway indicates that the discovery of Daniels' inappropriate computer
usage "may have been the icing on the cake" for Singer, prompting him to support
Daniels' discharge from the Department. (Hearthway Dep. 91:12-91:15). Singer
states that he was not "privy to . . . any discussions . . . about a recommendation for
separation based on" Daniels' internet browsing history. (Singer Dep. 56:51-56:24).
A pragmatic assessment of these propositions reveals no inherent discord. In the
first instance, Hearthway hypothesizes as to Singer's cogitations regarding Daniels'
illicit conduct. In the second, Singer reports on the substance and provenance of
the recommendations supporting Daniels' discharge. As such, the testimony of
record does not undercut defendants' stated reasons for terminating Daniels. (<u>See</u>
Hearthway Dep. 74:2-74:23).

The court also notes that the commencement of Hearthway's and Shore's
allegedly antagonistic treatment of Daniels predates his protected conduct

concerning racial discrimination.  (Daniels Dep. 105:25-108:4).  Daniels' evidence on this point consequently fails to support an inference of causation.

In sum, Daniels cannot establish the requisite causal connection through timing, inconsistent testimony, a pattern of antagonism, or any other circumstantial evidence that could support an inference of a retaliatory motive.  He has presented no evidence to suggest a causal link between his complaints of disparate racial treatment and his termination, let alone to show that such protected activity was the but-for cause of his termination.  See Nassar, 133 S. Ct. at 2533.  Accordingly, the court will grant defendants' motion for summary judgment as to Daniels' Title VII and PHRA retaliation claims.

### B.        Pennsylvania Whistleblower Act Retaliation Claim

As set forth *supra*, Daniels' federal claim will be dismissed under Rule 56.  The court declines to exercise supplemental jurisdiction over Daniels' remaining state law whistleblower claim.  28 U.S.C. § 1367; De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003).

IV.    **Conclusion**

Defendants' motion (Doc. 13) for summary judgment will be granted with respect to the Title VII and PHRA claims, and the case will be remanded to the Commonwealth Court of Pennsylvania.  An appropriate order will issue.


                                          /S/ CHRISTOPHER C. CONNER
                                          Christopher C. Conner, Chief Judge
                                          United States District Court
                                          Middle District of Pennsylvania


Dated:        November 3, 2015